**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 18 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARION J. WELLS,

        Plaintiff-Appellant,

   v.

COLORADO DEPARTMENT OF
TRANSPORTATION, GUILLERMO
VIDAL, in his official capacity as
Executive Director, Department of
Transportation, RICHARD L.
ORTON, in his individual capacity,
and ROBERT P. MOSTON, in his
individual capacity,

        Defendants-Appellees.

No. 01-1508

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 97-WM-95)**

---

John Mosby (Elisa Moran, with him on the briefs), Denver, Colorado, for
Plaintiff-Appellant.

Thomas J. Lyons of Hall & Evans, L.L.C. (Andrew D. Ringel, with him on the
brief), Denver, Colorado, for Defendants-Appellees.

---

Before **KELLY** , **McKAY** , and **HARTZ** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

Plaintiff Marion Wells appeals the district court's grant of summary judgment dismissing all her claims. She sued her former employer, the Colorado Department of Transportation (CDOT), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging that the CDOT had taken various adverse actions against her in retaliation for her repeated complaints of gender discrimination. She also sued two of her former supervisors in the CDOT, Robert Moston and Richard Orton, under 42 U.S.C. § 1983, alleging that they had violated her constitutional right to petition the government by retaliating against her for bringing a gender-discrimination complaint against the CDOT. We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand on her Title VII claim that she was fired in retaliation for gender-discrimination complaints. But we affirm on all other claims against the CDOT and the individual defendants, either because CDOT's alleged misconduct did not rise to the level of an adverse action subject to Title VII or because Plaintiff failed to establish the necessary causal connection between the adverse action and her protected conduct.

## I. **Background**

We review the district court's grant of summary judgment de novo, considering the evidence in the light most favorable to the appellant. *Wilson v.*

*Meeks*, 98 F.3d 1247, 1252-53 (10th Cir. 1996). We affirm unless the appellant points to evidence in the record establishing a genuine issue of material fact. *See* Fed. R. Civ. P. 56 (c). In other words, if a jury could not render a verdict in favor of the plaintiff even if it viewed all the evidence presented on the summary judgment motion in the light most favorable to the plaintiff, then the court should grant the defendant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

Plaintiff worked as a Civil Engineering Project Manager at the CDOT. Defendant Orton was the Glenwood Springs Resident Engineer and Plaintiff's direct supervisor during most of the events underlying this litigation. Defendant Moston had indirect supervisory authority over Plaintiff in his position as the Regional Transportation Director of Region 3, which included the Glenwood Springs Residency. Mr. Moston was the "appointing authority" for the region, giving him final authority over personnel decisions.

In Plaintiff's §1983 claims against Mr. Moston and Mr. Orton, she contends that the First Amendment right to petition the government (as applied to the states under the Fourteenth Amendment, *DeJonge v. Oregon*, 299 U.S. 353, 364-65 (1937)) protected her from retaliation for filing a lawsuit to enforce an agreement she had reached with the CDOT in settlement of a prior Title VII claim.

Mr. Moston and Mr. Orton do not dispute the legal premise behind Plaintiff's claim, but they deny that they engaged in retaliation.

Plaintiff's Title VII claim against the CDOT is also based on the conduct of Mr. Moston and Mr. Orton. In her Title VII claim she contends that Title VII protected her from retaliation for (1) seeking to enforce the earlier settlement agreement, (2) filing a complaint with the CDOT's internal employment-discrimination unit, (3) filing an internal discrimination grievance against Mr. Orton, and (4) filing charges with the federal Equal Employment Opportunity Commission (EEOC). The CDOT defends on the grounds that (1) its actions with respect to Plaintiff were not substantial enough to constitute adverse employment actions prohibited by Title VII, and (2) none of its actions was motivated by retaliation for her protected conduct.

The pertinent events began more than two decades ago. On September 16, 1980, Plaintiff filed a Title VII class action lawsuit against the CDOT, alleging gender discrimination. The parties to the suit entered into a court-approved settlement agreement in February 1986. Nine months later, Plaintiff, believing the CDOT was not honoring its commitments, filed a motion in district court to compel enforcement of the agreement. For reasons not apparent in the record before us, the magistrate judge did not issue a report and recommendation until January 3, 1995. The judge concluded that the CDOT was not in compliance with

the agreement. The district court disagreed, and on May 4, 1995, it orally informed the parties that it was going to close the case, which it did by written order of May 26, 1995.

Two months later Plaintiff received a job reassignment. Since 1994 she had served as the project engineer on the Aspen Guardrail Project, and since March of 1995 she had also served as the assistant project engineer on the Glenwood Springs Alternate Route Project. But on July 27, 1995, Mr. Orton assigned her to work full-time as the assistant project engineer on the Glenwood Springs project, thereby depriving her of the title of project engineer.

Several months later Plaintiff and Mr. Orton had an altercation with respect to the Glenwood Springs project. Mr. Orton had asked Plaintiff to supervise a concrete pour scheduled for November 3, 1995. At the pour site Plaintiff and Mr. Orton disagreed over which contract specifications should govern the pour. Mr. Orton overruled Plaintiff in front of coworkers and the contractors, and she, in turn, challenged his decision. Mr. Orton responded by telling Plaintiff that they could discuss the matter later and ordered her to leave the construction site. Plaintiff claims the dispute undermined her authority with the contractors. She cites an occasion after the pour when a contractor contacted the design consultant directly, rather than going through her, and then gave her orders. On November 7 she telephoned Mr. Orton, told him he had created problems for her with the

contractors, and asked him "what he was going to do about it." Aplt. App. at 266-67. Mr. Orton responded that within two weeks she would no longer be working under his supervision and that she would be "Moston's problem." Aplt. App. at 5. He then hung up on her.

After her conversation with Mr. Orton, Plaintiff contacted Mr. Moston to complain about Mr. Orton's conduct. Mr. Moston told Plaintiff that Mr. Orton did not have the authority to transfer or terminate her and that he, Mr. Moston, would look into the situation. On November 16, 1995, Plaintiff filed a formal grievance with Mr. Moston regarding the matter. Mr. Moston investigated Plaintiff's complaints, concluded that Mr. Orton had acted improperly, and counseled Mr. Orton that his conduct was both inappropriate and beyond his authority. Mr. Moston's investigation also caused him to conclude that Plaintiff and Mr. Orton could no longer work together and that one of them would have to be transferred. Mr. Moston notified Plaintiff that he had discussed the dispute with Mr. Orton and that he believed Mr. Orton's actions warranted no formal discipline. Mr. Moston also discussed with Plaintiff the possibility of finding her a different job assignment commensurate with her experience and qualifications.

In addition to complaining to Mr. Moston, Plaintiff filed a formal complaint with the CDOT's Center for Equal Employment Opportunity (CEEO) on November 14, 1995. Her complaint alleged that Mr. Orton discriminated

against her based on gender and retaliated against her for her lawsuit against the CDOT.

On November 16, the day she filed her formal grievance with Mr. Moston, Plaintiff took leave under the federal Family and Medical Leave Act (FMLA) due to job-related stress. She returned to work on December 6, 1995, but after five work days went back on leave starting December 15. At the direction of her physician and psychologist, Plaintiff remained on leave for an additional four months.

In April 1996 Mr. Moston asked Plaintiff to report back to work because her FMLA leave had expired. When she returned to work on April 12, she was told to report to the Glenwood Springs Residency under Mr. Orton's supervision. Seven days later, however, Mr. Moston informed Plaintiff that she would be transferred to the Grand Junction Residency. According to Mr. Moston, he decided to transfer Plaintiff rather than Mr. Orton because Mr. Orton was involved in several expensive and ongoing construction projects and it did not make sense to remove a person with that kind of responsibility. Despite Plaintiff's objection, the transfer took effect on April 24.

At Grand Junction, Plaintiff was to work as a project engineer under the supervision of James Patton, without any change in her job classification, rate of pay, or benefits. Initially, until additional project engineering work could be

transferred to keep Plaintiff busy, she was to split her time between two assignments, spending 55% of her time at the Grand Junction Residency and 45% at the CDOT traffic section. But Grand Junction had no project engineering work available for Plaintiff, so she was temporarily reassigned to spend all her time working in the traffic section.

Plaintiff considered the traffic work demeaning and below her job classification. She spent her time on the assignment standing on a street corner manually counting cars. Mr. Moston explained that he had no choice but to assign Plaintiff to work full-time in the traffic section, because while she was on leave the CDOT had allocated all the project engineering work for the season to other engineers. He claimed that Plaintiff would have been assigned project engineering work as it became available but it was not feasible to disrupt the work flow by pulling engineers off their assignments simply to accommodate Plaintiff's desire for a specific kind of work. Dissatisfied with her work situation, on June 22, 1996, Plaintiff filed Charges of Discrimination with the EEOC, alleging Mr. Moston and Mr. Orton discriminated against her based on gender and retaliated against her because of her prior lawsuit against the CDOT.

In addition, Plaintiff requested and received further medical leave based on work-related stress. Before starting her leave on July 1, 1996, she told

-8-

Mr. Moston that she would return to work when appropriate engineering assignments became available.

When Plaintiff exhausted her accrued leave time on September 27, 1996, Mr. Moston terminated her effective September 30, 1996. Before doing so, he did not ask Plaintiff to return to work, even though project engineering work had become available by the time of her termination. Mr. Moston claimed that he had no choice but to terminate Plaintiff because he had never received notice that she was able to return to work.

## II. **Title VII Retaliation Claim**

Plaintiff claims that the CDOT, through the conduct of Mr. Moston and Mr. Orton, discriminated against her in retaliation for actions she took in opposition to unlawful employment practices. This claim is based on 42 U.S.C. § 2000e-3(a), which states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

We consider these retaliation claims under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under that framework, Plaintiff must first establish a prima facie case by showing "that: (1) [she] engaged in protected opposition to discrimination; (2)

[she] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Contr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). "Once [Plaintiff] makes a prima facie showing, [the CDOT] must articulate a legitimate, nondiscriminatory reason for the adverse employment action. [Plaintiff] must [then] respond by demonstrating [that the CDOT's] asserted reasons for the adverse action are pretextual." *Id.* (internal citation omitted).

A. **Prima facie case**

1. *Protected activity*

The first element of the prima facie case—protected opposition to discrimination—is not at issue on appeal. The CDOT does not contest that Title VII protects Plaintiff against discrimination for (1) her lawsuit to enforce the settlement, which was resolved on May 26, 1995; (2) her internal CEEO complaint of November 14, 1995; (3) her internal grievance against Mr. Orton on November 16, 1995; and (4) her filing of EEOC charges on June 22, 1996.

2. *Adverse action*

Plaintiff must establish that she suffered an adverse employment action. "Although the Tenth Circuit liberally defines an 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." *Heno v. Sprint/United*

*Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (internal quotation marks omitted). To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998); *see Aquilino v. Univ. of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001) (indicating that adverse action must be "a significant change in employment status, such as . . . firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998))).

Plaintiff asserts that eight of the CDOT's acts were adverse actions within the meaning of our precedents: (1) her removal as project engineer on the Aspen Guardrail Project to work full-time as the assistant project engineer on the Alternate Route Project; (2) Mr. Orton's poor treatment of her on the cement pour site; (3) Mr. Orton's vow to have her removed from his residency; (4) Mr. Orton's refusal to assign her work after their disagreements; (5) Mr. Moston's refusal to discipline Mr. Orton; (6) her transfer from the Glenwood Springs Residency to the Grand Junction Residency; (7) her reassignment to count cars in the traffic section; and (8) her termination. We reject Plaintiff's first five assertions and accept the remainder. We begin with those we reject.

-11-

Plaintiff claims that it was an adverse action for Mr. Orton to remove her from her position as project engineer on the Aspen Guardrail Project and place her full-time as the assistant project engineer on the Glenwood Springs Alternate Route Project. To resolve this issue, we must first put the matter in context.

Within the CDOT there are two types of engineers—Professional Engineers and Civil Engineering Project Managers (CEPM). Professional Engineers have engineering degrees and are licensed. CEPMs usually do not have engineering degrees and are not licensed. Professional Engineers work as "project engineers" on large, complicated construction projects, whereas CEPMs work as "project engineers" on smaller, less complicated projects and as "assistant project engineers" (under the supervision of Professional Engineers) on larger projects. The descriptors "project engineer" and "assistant project engineer" are not official job titles and have no effect on pay; they merely reflect the positions that engineers occupy on particular construction projects.

Plaintiff was officially classified as a CEPM II (or its equivalent) in the years prior to the events of this litigation. Beginning in 1987 and continuing until November 1995, she worked as a project engineer on small- to medium-sized projects, and as an assistant project engineer on larger projects. Between late 1994 and mid-1995, she worked on two projects in different roles; she served as the project engineer on the smaller, less complex Aspen Guardrail Project, and,

beginning in March 1995, she served as the assistant project engineer on the larger Alternate Route Project. On July 27, 1995, Mr. Orton reassigned her to spend all her time on the Alternate Route Project. She claims the reassignment was an adverse action. We disagree.

Plaintiff's reassignment to work as an assistant project engineer on the Alternate Route Project was not out of the ordinary. Her job classification and rate of pay remained the same, and her position was similar to those she had occupied in prior years. As early as 1987 Plaintiff had worked as a project engineer and as late as 1994 she had worked as an assistant project engineer. On the Alternate Route Project, Plaintiff's work was similar to what she had been doing on the Aspen Guardrail Project, and at times the work was more sophisticated. Plaintiff frequently served as the acting project engineer on the $4 million Alternate Route Project when the assigned project engineer was away from the project. On these occasions Plaintiff oversaw larger and more complicated construction work than when she was the full-time project engineer on the $88,000 Aspen Guardrail Project. The record thus compels the conclusion that the reassignment did not adversely affect Plaintiff's employment status. *See Sanchez*, 164 F.3d at 532 (an involuntary lateral transfer did not constitute an adverse employment action when the transfer did not alter the plaintiff's responsibilities, salary, or benefits).

Plaintiff fares no better with her contention that Mr. Orton's poor treatment of her on the cement pour site was an adverse action. At the site Plaintiff and Mr. Orton had a disagreement over what contractual specifications should govern the pour. Mr. Orton had assigned Plaintiff to supervise the pour that day, but he was still Plaintiff's supervisor and the ultimate authority on projects occurring within his residency. Although Mr. Orton's behavior may have been inappropriate, we have followed other courts in holding that "unsubstantiated oral reprimands" and "unnecessary derogatory comments" are not in themselves "materially adverse employment action[s]." *Sanchez*, 164 F.3d at 533 (internal quotation marks deleted). Plaintiff emphasizes that the reprimand was uttered in the presence of persons who needed to respect her instructions. Nevertheless, the evidence pointed to by Plaintiff (the disrespect shown her by a contractor a few days after the incident) does not establish a loss of authority that was severe or prolonged enough to constitute a "materially adverse" reduction in job responsibilities. Accordingly, she suffered no adverse action under Title VII.

Plaintiff also claims that Mr. Orton's vow to transfer her was an adverse action. During a telephone conversation four days after the dispute at the pour site, Plaintiff demanded to know "what [Mr. Orton] was going to do about" the difficulties she claimed to be having with contractors. Aplt. App. at 266-67. In response he told her that she would soon be out of his residency. This "threat,"

however, did not in itself adversely affect Plaintiff's employment. Mr. Orton had no authority to transfer Plaintiff. Later, we will examine the transfer itself as a possible adverse action.

Plaintiff further contends that Mr. Orton's refusal to assign her work after their dispute was an adverse action. But the failure to assign work was for too brief a period to rise to the level of an adverse action. Mr. Orton and Plaintiff had their telephone confrontation on Tuesday, November 7, 1995. Later that evening Plaintiff contacted Mr. Moston to discuss the incident, and Mr. Moston told her that he would investigate the situation and get back to her. Seven business days later, on Thursday, November 16, 1995, Plaintiff went on medical leave. She returned to Mr. Orton's residency for five work days in December and then went back on leave until April 1996. After returning in April, she was back in Mr. Orton's residency for seven days before being transferred to Grand Junction. Thus, when she complains of not receiving work from Mr. Orton, she is talking about at most a total of 19 working days (seven in November, five in December, and seven in April), over a period of approximately five months. Seven of these days immediately followed Plaintiff's confrontation with Mr. Orton—a period during which Mr. Moston was investigating Plaintiff's complaints. And the seven days at the end of Plaintiff's tenure in Mr. Orton's

-15-

residency was the period during which Mr. Moston was considering, and then arranging for, Plaintiff's transfer to Grand Junction.

The long-term planning involved in the CDOT's road construction projects makes it difficult to assign an engineer to a project on short notice. Generally, engineers are assigned months before construction is to begin. Of course, assignments can be shuffled to accommodate new engineers who can use work, but immediate accommodation could cause significant losses in efficiency. As a consequence, failure to assign a project immediately to an engineer who has unexpectedly become available is not a reflection on the engineer's quality of work and does not diminish the engineer's status. Plaintiff has failed to present sufficient evidence to establish that the failure to assign her work for three brief periods constituted a "materially adverse" reduction in job responsibilities.

Plaintiff also asserts that Mr. Moston's refusal to discipline Mr. Orton for Mr. Orton's inappropriate treatment of her was an adverse action. We fail to see how Mr. Moston's lack of action with respect to a third party (Mr. Orton) materially affected Plaintiff's employment status. Although Plaintiff might receive some personal satisfaction or vindication from punishment of her perceived nemesis, her conditions of employment were not materially affected by the lack of discipline. After all, by the time Mr. Moston reached a conclusion on Plaintiff's grievance against Mr. Orton in January 1996, she was already on leave

and was having no contact with Mr. Orton. When she returned to work in April 1996, she was under Mr. Orton's supervision for only seven days before being transferred. Nothing in the record indicates that Mr. Moston's failure to punish Mr. Orton had any effect on Plaintiff's employment status during the time she remained under his supervision. Moreover, if the failure to punish Mr. Orton did lead to adverse actions against her, her Title VII claim would need to be based on those actions rather than on the failure to discipline Mr. Orton.

Plaintiff's last three assertions of adverse action prove more successful. We address together the first two—her transfer from Glenwood Springs to Grand Junction and her reassignment to count cars in the traffic section. Prior to the transfer from Glenwood Springs to Grand Junction, Plaintiff served as either an assistant project engineer or a project engineer on construction projects in the Glenwood Springs Residency. She had fairly significant responsibilities; among other things, she supervised contractors, kept extensive records of project development and cost, contacted landowners to discuss the effect of construction projects on their land, and coordinated efforts with various other governmental agencies and utility companies.

Those work duties changed dramatically when she was transferred. Although Plaintiff retained the same rate of pay and the same job classification, she never performed project engineering work at the new location. Upon transfer,

she was immediately reassigned to a temporary stint in the traffic section. Plaintiff's job, for the nearly two months that she was assigned to the traffic section, consisted of standing on a street corner manually counting cars. This evidence would support a determination that Plaintiff suffered a "materially adverse" alteration in job responsibilities. *See Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("[R]eassignment with significantly different responsibilities . . . generally indicates an adverse action." (internal quotation marks omitted)); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999) (factfinder could conclude that employee's reassignment to position with different job responsibilities and more contact with inmates was an adverse employment action).

Similarly, Mr. Moston's termination of Plaintiff was an adverse action. It hardly requires stating that when an employer tells an employee that she no longer has a job, that employee's job status has been significantly and materially altered. *See Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000) (termination is an adverse action under Title VII).

### 3. *Causal connection*

Next we consider whether there is sufficient evidence to support the causal-connection element of Plaintiff's prima facie case—that is, whether there was a retaliatory motive behind the adverse actions.

## a. Transfer to Grand Junction and assignment to traffic section

There are three instances of protected activity predating Plaintiff's transfer to Grand Junction and her reassignment to the traffic section: (1) her participation in the class action lawsuit; (2) her internal CEEO complaint of November 14, 1995, alleging misconduct by Mr. Orton; and (3) her internal grievance against Mr. Orton on November 16, 1995. Plaintiff has produced insufficient evidence to establish a causal connection to the first of these protected activities, but can show a causal connection to the second and third.

The claim of retaliation for her class action lawsuit strains credulity. To support her claim, Plaintiff contends that Mr. Moston thought her lawsuit was frivolous. She points to the deposition testimony of one of Mr. Moston's colleagues, Rebecca Doane, who testified that "[Mr. Moston] probably didn't say to me, 'I disapprove of Marion Wells' lawsuit,' but he made it quite clear that he considered it frivolous, not valid, a pain in the ass." Aplt. App. at 44. Plaintiff offers no evidence of when Mr. Moston had these thoughts. There is no evidence of how Mr. Moston made his feelings "quite clear" to Ms. Doane. And, perhaps most importantly, there is no evidence that Mr. Moston ever took action based on his feelings. In fact, Ms. Doane herself testified that she did not believe that Mr. Moston retaliated against Plaintiff.

Moreover, there is a remarkable delay of more than seven years between when Mr. Moston learned of Plaintiff's lawsuit and when he allegedly took adverse employment action against her. Plaintiff filed the suit in 1980, and it was settled in 1986. Later in 1986, she moved to compel enforcement of the settlement. Mr. Moston learned of the suit in 1988. The district court announced that it would deny the motion and close the case in May 1995. Why anyone in the CDOT would wait until April 1996 to retaliate against Plaintiff is a mystery she fails to explain. She suggests that those who wished to retaliate were simply waiting to be free from the settlement agreement, but that is sheer speculation.

Plaintiff can, however, show a causal connection between her CEEO complaint and grievance submitted in November 1995, and her transfer and reassignment in April 1996. In November 1995, two days after she filed her CEEO complaint and the day she filed her internal grievance, Plaintiff went on medical leave. She returned to work for five days in December, but then went back on leave until Mr. Moston told her to return to work in April 1996. Seven days after her return—five months after her complaints—Plaintiff was transferred to Grand Junction and immediately reassigned to the traffic section.

A five-month gap between a protected activity and an adverse action would ordinarily be too great a time lapse to support an inference of causation based on timing alone. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th

-20-

Cir. 1999) ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.") (internal citation omitted). But the unique circumstances here suggest that this is properly considered a close-proximity case. The reason that a five-month gap generally does not in itself suffice to establish causation is that anger or resentment—the motivation for possible retaliation—is an emotion that tends to diminish with time. When retaliation for an act occurs well after the act, one wonders why the retaliator failed to act sooner. In this case, however, Plaintiff was on leave during most of the time between her filing the CEEO complaint and grievance, and her transfer and reassignment. Even if Mr. Moston had a desire to retaliate for the November complaints, it did not make sense for him to do so until Plaintiff returned to work. In fact, that is just what happened—only days after Plaintiff's return to work in April, the transfer and reassignment were effectuated. We think a jury could reasonably draw a retaliatory inference based on the timing of these events. *See Richardson*, 180 F.3d 426, 434, 444 (causal connection shown when plaintiff was transferred immediately after returning from a year-long leave of absence, eight months after filing EEOC complaint).

      b.  Termination

-21-

We also believe that Plaintiff can point to sufficient evidence in the record to show a causal connection between her September 30, 1996, termination and her June 22, 1996, EEOC charge. Three circumstances support her claim. First, the person who fired her, Mr. Moston, was specifically accused of discrimination in her EEOC complaint and was aware of its filing.

Second, the termination was close in time to when Mr. Moston learned of her EEOC complaint. The record is not precise regarding when Mr. Moston first heard of the complaint. The record contains only a stipulation that he knew of the complaint by September 3. Thus, the temporal proximity was between four weeks (if Mr. Moston did not learn of the complaint until September 3) and three months (if Mr. Moston learned of the complaint immediately upon its filing). Three months ordinarily would not be a sufficiently short period to imply causation, *see Anderson*, 181 F.3d at 1179; here again, however, the special circumstances suggest that we should treat this as a close-proximity case. Plaintiff was on leave during the entire period between her filing the EEOC complaint and her termination. Mr. Moston could not have taken retaliatory action against her during that period, at least not without his motive being painfully obvious, since she could have performed no work during that period to justify any discipline. As soon as Mr. Moston had a plausible basis for taking action against Plaintiff—the fact that her accrued leave time had expired—he did so immediately. The timing

-22-

of Plaintiff's termination is consistent with the contention that Mr. Moston desired to terminate her promptly upon learning of the EEOC complaint. *See Richardson*, 180 F.3d at 434, 444.

The third source of support for this claim is the evidence that the reason given for her termination was pretextual. When evidence indicates that an employer's proffered reason for taking an adverse action is false, a factfinder can decide that the employer was lying to mask its true unlawful purpose. In *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 147 (2000), the Supreme Court, in an Age Discrimination in Employment Act case, noted that

> the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

(internal quotation marks and citations omitted).

*Reeves'* reasoning applies with equal force to Title VII retaliation claims. The causal-connection element of a prima facie retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity. If the employee can show that the

employer's proffered reason for taking adverse action is false, the factfinder could infer that the employer was lying to conceal its retaliatory motive.

We understand that by considering an employer's proffered reasons for taking adverse action in the causal-connection portion of the prima facie case, we are assessing pretext evidence that is typically considered in a later phase of the *McDonnell Douglas* analysis. But we agree with the Third Circuit that evidence of pretext can be useful in multiple stages of a Title VII retaliation claim. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3rd Cir. 2000). The *Farrell* court wrote:

> We recognize that by acknowledging that evidence in the causal chain can include more than demonstrative acts of antagonism or acts actually reflecting animus, we may possibly conflate the test for causation under the prima facie case with that for pretext. But perhaps that is inherent in the nature of the two questions being asked—which are quite similar. The question: "Did her firing result from her rejection of his advance?" is not easily distinguishable from the question: "Was the explanation given for her firing the real reason?" Both should permit permissible inferences to be drawn in order to be answered. As our cases have recognized, almost in passing, evidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other. It is enough to note that we will not limit the kinds of evidence that can be probative of a causal link any more than the courts have limited the type of evidence that can be used to demonstrate pretext.

*Id.* at 286 (internal citations omitted).

In this case Mr. Moston testified that he terminated Plaintiff because she had exhausted her sick leave and had failed to provide a medical release allowing

her to return to work. He stated that he had no obligation to contact her to ask whether she was ready to resume her duties.

Plaintiff contends, however, that she made clear to Mr. Moston that she needed to take leave only until suitable work was available. She has evidence from which a rational factfinder could infer that her version is correct. When Plaintiff went on medical leave on June 16, 1996, the medical certification form filled out by Plaintiff's psychologist stated that leave was required because "[e]mployee was not allowed to return to work at the level of which she was capable. This resulted in further deterioration of emotional equilibrium." Aplt. App. at 910. The form said that she could not return to work "under current condition[s]." *Id.* In addition, Plaintiff testified that she informed Mr. Moston that she was prepared, and medically able, to return to work when appropriate project engineering assignments became available. Nevertheless, after Plaintiff left, Mr. Moston never contacted her to ask that she return to do job-appropriate project engineering work, despite the fact that such work soon became available.

Plaintiff further points out that Mr. Moston never contacted her to ask her to return to work as her leave time was about to expire; instead, he simply sent her a termination letter. In contrast, when her FMLA leave had expired in April 1996, Mr. Moston sent a letter to ask that she return to work (which she did). Even if Mr. Moston is correct that he was under no legal duty to ask employees to

return, his failure to do so, in light of her request and explanation to him, could reasonably be viewed as retaliation. The issue is not what the personnel rules required Mr. Moston to do, but whether he treated her differently than he would have if she had not engaged in protected activity.

In sum, Plaintiff's evidence that she was terminated in retaliation for her EEOC complaint is sufficient to satisfy the causal-connection element of the prima facie case.

**B. <u>Nondiscriminatory reasons and evidence of pretext</u>**

We now turn to the second and third steps of the *McDonnell Douglas* burden-shifting framework for Plaintiff's retaliation claim. The CDOT has proffered nondiscriminatory reasons for the transfer, the reassignment to the traffic section, and the termination of Plaintiff. Our task is to consider whether Plaintiff has shown those asserted reasons to be pretextual.

1. *Transfer to Grand Junction and assignment to traffic section*

Plaintiff is unable to rebut the legitimate reasons the CDOT has offered for transferring Plaintiff and reassigning her to the traffic section. The CDOT's purpose for Plaintiff's transfer to Grand Junction was to end the hostile relationship between her and Mr. Orton. Both Plaintiff and Mr. Orton expressed the belief that they could not work together. Ordinarily one would expect that the subordinate rather than the supervisor would be transferred. Grand Junction was

the site nearest Plaintiff's home other than Mr. Orton's Glenwood Springs Residency. Plaintiff has produced no evidence to indicate that the reason given for the transfer was pretextual.

Similarly, the CDOT presented unrebutted reasons for assigning Plaintiff to count cars. Mr. Moston testified that Plaintiff was given the assignment on a temporary basis, not to exceed six months, because he had no project engineering work available for her in Grand Junction and because there was work that needed to be done in the traffic section. The residency's engineering work for the season had already been assigned while Plaintiff was still on leave. Other project engineers had begun developing those projects and Mr. Moston did not consider it feasible to disrupt the work flow by removing a project engineer from an existing project solely to accommodate Plaintiff. When he decided to transfer Plaintiff to Grand Junction, he knew that no project engineering work was available, but thought some soon would be. Two project engineers then working in the residency were expected to retire soon. When they did, Plaintiff was to take over their work. Additionally, if other work became available in Region 3, it was Mr. Moston's stated intention to transfer it to Plaintiff at Grand Junction. Mr. Moston claims that the only reason Plaintiff never received project engineering work is that she went back on medical leave on June 16, 1996, before any such work materialized.

Plaintiff is unable to point to evidence indicating that Mr. Moston's explanation for the car-counting assignment was pretextual. She presented no evidence that previously unassigned project engineering work was available when she was working in the traffic section. And she offered nothing to show that it would have been feasible for Mr. Moston to reassign an existing project to her. Given the lack of engineering work, Mr. Moston had no perfectly attractive alternative. Should he have displaced another engineer who had invested valuable time on a project just to make room for Plaintiff? Was he supposed to allow her to sit at a desk and await work she considered appropriate? The most reasonable course of action was the one selected: assign Plaintiff temporary work that needed to be done and then reassign her to project engineering work when it became available.

2. *Termination*

Plaintiff is more successful on the termination portion of her claim. Although the CDOT offered legitimate nondiscriminatory reasons for terminating Plaintiff, the causal-connection discussion above shows that Plaintiff produced sufficient evidence that those reasons were pretextual. Accordingly, resolution of this portion of the dispute must be left to a jury. *See Randle* v. *City of Aurora,* 69 F.3d 441, 451 (10th Cir. 1995) ("If the plaintiff succeeds in showing a prima facie case and presents evidence that the defendant's proffered reason for the

employment decision was pretextual—i.e. unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial."). We therefore reverse the district court's grant of summary judgment on Plaintiff's Title VII claim that her termination was in retaliation for her EEOC complaint, and remand to the district court for further proceedings consistent with this opinion.

III. **First Amendment Claim**

We can dispose summarily of Plaintiff's First Amendment claim under 42 U.S.C. § 1983. The basis of this claim is that Mr. Orton and Mr. Moston retaliated against her because of the class action suit she brought against the CDOT in 1986, which was dismissed on May 26, 1995.

The alleged retaliation ranged from her July 27, 1995, transfer from her assignment as project engineer on the Aspen Guardrail Project to her termination in September 1996. Although we have held that some of this alleged retaliation did not rise to the level of adverse action under Title VII, those same actions may suffice to support a claim under §1983. *Cf. Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir. 1999) (transfer with same title and job responsibilities is portion of foundation of claim held actionable under First Amendment).

Regardless, we hold that the summary judgment on this claim must be affirmed. As previously discussed with respect to Plaintiff's Title VII claim, we

refuse to sustain a claim that must rest on speculation that those offended by a lawsuit that had been ongoing for nearly nine years would retaliate only after the suit was dismissed.

We need address only one item of evidence relied upon by Plaintiff that we had no occasion to mention in discussing her Title VII claim. She contends that Mr. Orton's discriminatory motive in removing her as the project engineer on the Aspen Guardrail Project (which was not an adverse action under Title VII) is established by the falsity of his deposition testimony concerning why he assigned her to work full-time as assistant project engineer on the Alternate Route Project. We disagree. Mr. Orton was never asked why he modified her assignment. The "false" testimony was no more than Mr. Orton's faulty recollection—four years after the fact, and without any documentation to refresh his memory—regarding when the modification occurred and how active the Aspen project was at the time. Even examining the evidence in the light most favorable to Plaintiff, she lacks sufficient evidence to support her § 1983 retaliation claim.

## IV. Conclusion

We **AFFIRM** the summary judgment in favor of the individual defendants Mr. Moston and Mr. Orton on Plaintiff's First Amendment claims, and **AFFIRM** the summary judgment against Plaintiff on her Title VII claims against the CDOT, except that we **REVERSE** the summary judgment on Plaintiff's claim that her

termination was in retaliation for her EEOC complaint and **REMAND** for further proceedings on that claim.

No. 01-1508 -   <u>Wells v. Colorado Department of Transportation</u>

**HARTZ** , Circuit Judge, writing separately:

I write separately to express my displeasure with the mode of analysis employed in the panel opinion (which I authored).  The       *McDonnell Douglas* framework only creates confusion and distracts courts from "the ultimate question of discrimination   *vel non* ."  *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983).  *McDonnell Douglas* has served its purpose and should be abandoned.  Moreover, and perhaps more importantly, the Supreme Court has recognized the problems created by *McDonnell Douglas* and given us a precedent which enables us to ignore *McDonnell Douglas* without violating our lower-court duty to follow the dictates of the Supreme Court.  *See Aikens,* 460 U.S. at 714-16.

The *McDonnell Douglas* framework is a departure from the approach appellate courts customarily use in evaluating the sufficiency of the evidence to sustain a plaintiff's case, whether reviewing judgments after trial or summary judgments.  Our usual procedure is to set forth the elements of the plaintiff's cause of action and then determine whether there is sufficient evidence for a reasonable person to find that each element has been proved.  If the defendant relies on an affirmative defense (where the defendant has the burden of persuasion), we may need to conduct a similar analysis with respect to the

elements of the defense. In evaluating the sufficiency of the evidence to support an element of the claim or defense, we employ an informed common sense. We are guided by the thinking expressed by other courts. But, recognizing that every case is unique, we know that we cannot simply incorporate some formula and make our task a mechanical one.

So how did the Supreme Court come to adopt the artificial formalism of the *McDonnell Douglas* framework? I am sure it was for the best of motives, and the framework likely conveyed some important points that educated the nation's courts. Now, however, these lessons are deeply ingrained in the judiciary, and the artificiality of the framework exacts a significant, unnecessary expense—in terms of both wasted judicial effort and greater opportunity for judicial error.

It is useful to review the development of the framework. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796 (1973), the plaintiff's complaint accused McDonnell Douglas of discriminating against him on the basis of race and in retaliation for his civil rights activity. The district court dismissed the racial discrimination claim because the Equal Employment Opportunity Commission (EEOC) had failed to make a finding of reasonable cause to believe the claim. *Id.* at 797. After a bench trial on the retaliation claim, the court found in favor of McDonnell Douglas. *Id.* The evidence at trial was as follows: The plaintiff had been laid off as part of a general reduction in force. *Id.* at 794.

Protesting his discharge and McDonnell Douglas's hiring practices, the plaintiff led a protest which disrupted the company's operations. *Id.* at 794-95. Three weeks later McDonnell Douglas advertised openings in positions for which the plaintiff was qualified. *Id.* at 796. When the plaintiff applied, McDonnell Douglas refused to hire him, justifying the refusal on the basis of his obstructive protests. *Id.*

On appeal the circuit court had affirmed the judgment on the retaliation claim but reversed on the discrimination claim, holding that the plaintiff could bring the action without a prior reasonable-cause finding by the EEOC. *Id.* at 797-98. The court also enunciated standards to guide the trial on remand. *Id.* at 798.

The content of those standards was the chief concern of the Supreme Court's *McDonnell Douglas* opinion. The Supreme Court set forth its initial formulation of what has become known as the *McDonnell Douglas* framework. First, it held that a plaintiff may establish "a prima facie case of racial discrimination . . . by showing: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications." *Id.* at 802. The Court did

not explain precisely what it meant by "a prima facie case." That task was left to a footnote in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), which I will discuss later. The Court did say, however, that since plaintiff had proved his prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Finally, the Court held that even if the employer does supply such a reason, the employee must have a fair opportunity to prove that the proffered reason is pretextual. *Id.* at 804-05.

The Court concluded its opinion as follows:

> In sum, respondent should have been allowed to pursue his claim [of racial discrimination]. If the evidence on retrial is substantially in accord with that before us in this case, we think that respondent carried his burden of establishing a prima facie case of racial discrimination and that petitioner successfully rebutted that case. But this does not end the matter. On retrial, respondent must be afforded a fair opportunity to demonstrate that petitioner's assigned reason for refusing to re-employ was a pretext or discriminatory in its application. If the District Judge so finds, he must order a prompt and appropriate remedy. In the absence of such a finding, petitioner's refusal to rehire must stand.

*Id.* at 807. Thus, the Court established a three-step framework: (1) the plaintiff's proof of a prima facie case, (2) the employer's presentation of a legitimate reason for its adverse action, and (3) the employee's opportunity to prove that the proffered reason was pretextual.

Among the lessons taught by *McDonnell Douglas* are (1) discriminatory motive may be proved by circumstantial evidence, in particular by the prima facie case described in the opinion; (2) the employer may prevail over such circumstantial evidence by providing evidence of a proper motive; and (3) the plaintiff is not bound by the employer's evidence of a proper motive and may show the proffered motive to be pretextual. Now, all of these lessons could be taught, and applied, using the customary method of evaluating the sufficiency of the evidence. No additional formal three-step framework is necessary to recognize that circumstantial evidence can prove intent, etc. The *McDonnell Douglas* reader is therefore likely to infer that there must be some additional reason for establishing the framework—the framework must be imposing some further constraints on the analysis. For instance, rather than evidence of a proper motive being just a way of overcoming a circumstantial case, perhaps establishing a proper motive is an affirmative defense, for which the employer bears the burden of persuasion.

The answer to that question was provided by *Burdine*. In that opinion the Court considered "[t]he narrow question . . . whether, after the plaintiff has proved a prima facie case of discriminatory treatment, the burden shifts to the defendant to persuade the court by a preponderance of the evidence that legitimate, nondiscriminatory reasons for the challenged employment action existed." 450 U.S. at 250. The Court began the analysis by reformulating the *McDonnell Douglas* framework:

> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

*Id.* at 254. A footnote at the end of the last sentence pointed out that the Court had been using the term "prima facie case" in a special sense:

> The phrase "prima facie case" not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue. *McDonnell Douglas* should have made it apparent that in the Title VII context we use "prima facie case" in the former sense.

*Id.* at 254 n.7 (citations omitted). In other words, a *McDonnell Douglas* "prima facie case" is not, contrary to the customary use of the term, simply sufficient evidence to allow the case to go to the jury.

-6-

The Court went on:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. . . . If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted . . . . The plaintiff retains the burden of persuasion.

*Id.* at 254-56 (citation omitted). Hence, once the defendant produces evidence of a legitimate nondiscriminatory reason for the adverse action (regardless of whether the factfinder believes the reason), the presumption disappears and one considers the case as if there were no presumption. To answer the question posed at the outset of the Court's opinion, the employer does not bear the burden of persuasion (just a burden of production) to establish a proper motive for its action against the plaintiff; proving a proper motive is not an affirmative defense.

*Burdine* did not, however, dispel all confusion. Indeed, by clarifying that the prima facie case did not shift the burden of persuasion, it raised the question whether the *McDonnell Douglas* framework accomplished much of anything. To be sure, proof of the prima facie case put the burden on the employer to produce evidence of a proper motive. But doesn't the employer almost always do that? And then the presumption disappears, so what has been accomplished?

-7-

The consequences could have been predicted. Often when confronting the great mysteries in life, the more we don't understand them, the more we resort to unthinking use of formulas, worrying about technicalities instead of comprehension and meaning. That has happened in applying *McDonnell Douglas*.

Rather than concentrating on what should be the focus of attention —whether the evidence supports a finding of unlawful discrimination—courts focus on the isolated components of the *McDonnell Douglas* framework, losing sight of the ultimate issue. In particular, by always commencing the analysis with an examination of whether the plaintiff established a prima facie case, instead of whether the evidence as a whole could support a verdict in favor of the plaintiff, judicial opinions imply that the court's task is simplified by first looking at just the prima facie case. The sense is conveyed that unfounded claims can be disposed of more readily if one can concentrate on the prima facie case and determine whether the plaintiff can leap that hurdle. But how could that be so? Is it really possible that *McDonnell Douglas*—which was viewed at the time as a plaintiff-friendly opinion—could require judgment against a plaintiff when the evidence as a whole would support a plaintiff's verdict but the plaintiff somehow has not made out a prima facie case?

Such a peculiar result could obtain only if the *McDonnell Douglas* framework in some way restricts how a plaintiff can prove discrimination. I don't

think that is the case, but the *McDonnell Douglas* framework could lead one to arrive at that conclusion.  Let me give three examples.

First, in *McDonnell Douglas* the Court set forth the following prima facie case:  a plaintiff must show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications."  411 U.S. at 802.  Is one to believe that a plaintiff claiming a discriminatory failure to hire can prevail only by proving the four elements of this scenario?  To be sure, *McDonnell Douglas* itself said that the prima facie case it described was not meant to be exclusive. The Court wrote, "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations."  411 U.S. at 802 n.13.  Yet even this qualification implies that the four elements of the *McDonnell Douglas* prima-facie-case scenario could be replaced only by some other similar scenario.  The very failure to say simply, "a prima facie case is whatever evidence could convince a rational factfinder to find discrimination," suggests that something further—a proper fit into a formal structure—is required.

Second, the *McDonnell Douglas* formalism indicates that the evidence can,

-9-

and should, be compartmentalized when evaluating its sufficiency. It is necessary to decide initially whether the plaintiff has established a prima facie case. Next the court looks at the employer's proffered nondiscriminatory reason for the adverse action, and finally it considers the evidence of pretext. A natural inference is that at the prima-facie-case stage of the analysis, it is improper to address the employer's proffered motive and whether it is pretextual. This panel has rejected that inference (after all, for what conceivable reason should the employee's cause of action be barred when evidence of pretext could convince a reasonable factfinder that the employee had been subjected to unlawful discrimination?). But the issue is not a trivial one.

Third, the *McDonnell Douglas* formalism can lead to confusion regarding how to incorporate into the analysis discriminatory statements by the employer. Such statements can, of course, be the most convincing evidence of discriminatory intent. If the person in charge says, "I didn't hire her because she's black," the case is made. In that event, why bother with the *McDonnell Douglas* framework? Indeed, there is authority for the proposition that the *McDonnell Douglas* framework is "inapplicable" when the employee "presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Such doctrine thus requires a court to decide whether a certain item of evidence is direct evidence. In this case, for example, would

-10-

testimony that Mr. Moston called Plaintiff's lawsuit a "frivolous . . . pain in the ass" be direct evidence of discrimination? If the evidence is "direct evidence," must we then abandon the *McDonnell Douglas* framework in our review of the case? If it is not "direct evidence," how does it fit within the *McDonnell Douglas* framework? Rather than simply deciding whether the evidence is sufficient to sustain the plaintiff's claim, the courts must engage in the singularly unproductive exercise of deciding whether some item of evidence is "direct evidence" in order to decide how to go about analyzing whether the plaintiff's claim survives. *See, e.g., Perry v. Woodward*, 199 F.3d 1126, 1134-35 (10th Cir. 1999). I would have thought that by now the distinction between direct and circumstantial evidence would have been disregarded in considering the sufficiency of the evidence to support a claim. The point I wish to emphasize here, however, is how the use of the *McDonnell Douglas* framework so readily lends itself to consideration of formalities instead of the essence of the issue at hand—the sufficiency of the evidence. (A wonderful example of what the *McDonnell Douglas* framework can do to a good mind is the opinion in *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640 (7th Cir. 2002).)

What is particularly puzzling about all this is that it seems completely unnecessary. Once the employer presents evidence of a legitimate nondiscriminatory motive for its adverse action against the plaintiff, the

presumption disappears and the factfinder examines the evidence as if there were no prima-facie-case requirement. I would expect that in virtually every Title VII case in which the *McDonnell Douglas* framework is now applied, the employer produces evidence of such a motive. One might argue that employers produce such evidence in order to avoid application of the presumption. But even without that incentive for employers, the plaintiff will almost certainly inquire during discovery about the employer's reason for taking adverse action against the plaintiff. And if the employer cannot produce evidence of a legitimate nondiscriminatory reason, the employer's lawyer will insist on settling.

One therefore wonders why we need to have this artificial, often confusing, framework. The answer is that there is no need. The Supreme Court pointed this out in *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711 (1983). That opinion begins with the well-recognized proposition: "[W]hen the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the *McDonnell-Burdine* presumption 'drops from the case' . . . ." *Id.* at 714-15 (quoting *Burdine*, 450 U.S. at 255 n.10).

But the Court went further, expressing surprise that the lower courts had been concerned about whether the plaintiff had made out a prima facie case after the case had been fully tried on the merits. *Id.* at 713-14. It stated that when the defendant puts on evidence of its reasons, it does not matter whether the plaintiff put on evidence of, much less established, a prima facie case. *Id.* at 715. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Burdine*, 450 U.S. at 253). Criticizing the lower courts' references to *McDonnell Douglas* in resolving the case before it, the Court continued: "On the state of the record at the close of the evidence, the District Court in this case should have proceeded to this specific question directly, just as district courts decide disputed questions of fact in other civil litigation." *Id.* at 715-16. The "sensitiv[ity] and difficult[y]" of discrimination cases does not mean "that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern 'the allocation of burdens and order of presentation of proof.'" *Id.* at 716 (quoting *Burdine*, 450 U.S. at 252). (I do not think it is coincidental that *Aikens* was decided only two months

-13-

before the Supreme Court adopted a "totality of circumstances" test for evaluating probable cause under the Fourth Amendment, rejecting what it termed a "rigid" test based on the standards set forth in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), for evaluating informant information. *See Illinois v. Gates*, 462 U.S. 213, 231-39 (1983).)

It seems to me that *Aikens* constitutes a de facto overruling of the *McDonnell Douglas* framework because, as previously noted, the employer will present evidence of a proper motive in almost every case. The only question that might remain is whether *Aikens* applies at the summary-judgment stage of the litigation. In other words, despite *Aikens*, must a court reviewing a motion for summary judgment go through each step of the *McDonnell Douglas* framework, "unnecessarily evad[ing] the ultimate question of discrimination *vel non*"? *Id.* at 714.

There are two reasons why one might answer "yes." First, *Aikens* involved review after trial and the Court said, "Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a *prima facie* case." *Id.* at 713-14. This may have been the basis for the following statement in *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000):

> [T]he three-part *McDonnell-Douglas* burden-shifting analysis is limited to the summary judgment context. Once there has been "a full trial on the merits, the sequential analytical model adopted from *McDonnell Douglas* . . . drops out and we are left with the single overarching issue whether plaintiff adduced sufficient evidence to warrant a jury's determination that adverse employment action was taken against" the plaintiff because of his or her protected status. *Fallis v. Kerr-McGee Corp.,* 944 F.2d 743, 744 (10th Cir. 1991); *see also U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714-15 (1983). Because this case was decided on summary judgment, we review the district court's application of *McDonnell Douglas.*

As far as I can tell, this is the only reported appellate decision that explicitly states that *Aikens* does not apply at the summary-judgment stage.

A second reason why one might believe that the *McDonnell Douglas* framework still applies to summary judgments is that otherwise, after *Aikens*, *McDonnell Douglas* would have virtually no role whatsoever; and if the Court had intended this result, one would have expected it to say so expressly. This logic has some force. But the failure of the Supreme Court, for whatever institutional reasons, to acknowledge the consequences of *Aikens* does not imply that the *McDonnell Douglas* framework applies only in the summary-judgment context. To be sure, after *Aikens* the Supreme Court has applied that framework when reviewing a summary judgment, *see O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308 (1996); but even more often the Court has invoked that framework when reviewing a post-trial judgment, *see, e.g., Reeves v. Sanderson*

-15-

*Plumbing Products, Inc.*, 530 U.S. 133, 138-39 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 505 (1993).

In any event, it makes no sense to apply *Aikens* post-trial but not at the summary-judgment stage. *McDonnell Douglas* was not developed as a tool for evaluation of motions for summary judgment. In *McDonnell Douglas* itself, the Court concluded its opinion by speaking of retrial of the case. There was no reference to summary judgment. In fact, the first, and only, Supreme Court decision to apply *McDonnell Douglas* at the summary-judgment stage was *O'Connor*, which was not decided until 23 years after *McDonnell Douglas*.

There is no reason to limit *Aikens* to review of judgments after trial. The *Aikens* analysis would seem to apply equally to review of a summary judgment when the employer has proffered evidence of its reasons for any adverse employment action against the plaintiff, at least absent a suggestion that discovery was in some way limited. After all, the test for summary judgment is whether the evidence would support a verdict at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Our review of a summary judgment is essentially the same as our review of a challenge to the sufficiency of evidence at trial. *Id.* at 250-51. If it is inappropriate to concern ourselves with whether the plaintiff has proved a prima facie case when we review a judgment after a trial in which the employer introduced evidence of its reasons for adverse actions against the

plaintiff, it should also be inappropriate to worry about the prima facie case when we review a summary-judgment proceeding in which the employer proffered such evidence.  The Supreme Court's concern about unnecessarily complicating the customary analysis of the sufficiency of the evidence is a concern that applies just as much to review of a summary judgment as to review of a jury verdict.  Thus, at least three other circuits have applied *Aikens* in reviewing motions for summary judgment.  *See Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 762-63 (D.C. Cir. 2002); *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 170 (6th Cir. 1996); *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 296 (7th Cir. 1998); *see also MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1122-23 (10th Cir. 1991) (Seth, J., concurring).

It is time for this circuit to devote our attention to "the ultimate question of discrimination *vel non*."  *Aikens*, 460 U.S. at 714.  Even if we must pay lip service to *McDonnell Douglas*, let us clear our minds of technical distractions by employing *Aikens* at the summary-judgment stage.  I doubt that our ultimate conclusions will be different in any significant number of cases.  But our task will be easier because we will have fewer technical barriers to the application of common sense; and there is always the risk that imposing needless complexity on our work will increase the chance of error.