**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 9 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

NANCY H. RENNARD,

      Plaintiff-Appellant,

v.

WOODWORKER'S SUPPLY, INC., a
Wyoming corporation,

      Defendant-Appellee.

No. 03-8031
(D.C. No. 02-CV-98-B)
(D. Wyo.)

---

**ORDER AND JUDGMENT** [*]

---

Before **EBEL**, **BALDOCK**, and **LUCERO**, Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

Plaintiff-appellant Nancy H. Rennard appeals the summary judgment

entered by the district court in favor of her former employer, defendant-appellee

---

[*]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Woodworker's Supply, Inc. (WSI), on her claims for hostile work environment sexual harassment, retaliation, and constructive discharge under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17. [1] We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed or are as alleged by plaintiff.

Plaintiff began working at WSI's facility in Casper, Wyoming on September 11, 2000. *See* Aplt. App. at 43 (pp. 14-15). On that day, she signed a document entitled "Important Policies," which stated as follows:

> [WSI] will not tolerate sexual or ethnic/racial harassment of or by any employee. Any occurrence of such harassment must be reported to the Personnel Manager or President in writing within one week. All reports will be promptly investigated with due regard for the privacy of all involved persons. Any employee found to have so harassed a fellow-employee or subordinate would be subject to severe discipline or discharge. We will not retaliate against any employee who makes a good faith report of alleged harassment.

---

[1] Having granted summary judgment in favor of WSI on all of plaintiff's federal claims, the district court declined to exercise supplemental jurisdiction over plaintiff's state-law claims, and the court dismissed the state-law claims without prejudice. Plaintiff is not challenging the dismissal of her state-law claims, and we therefore do not need to address that part of the district court's order.

Failure to report activity that you consider sexual harassment in accordance with the above is a violation of company rules and, as such, could subject you to discipline or dismissal.

*Id.* at 47 (pp. 31-32), 70.

On two separate occasions in October and November 2000, while on the job at WSI, plaintiff discovered that an unknown person or persons had put a pornographic picture of a naked man in her coat pocket. *Id.* at 49-50 (pp. 41-45). On two separate occasions during this same time period, plaintiff also discovered that an unknown person or persons had placed a condom in her coat pocket. *Id.* Although plaintiff informed a coworker about the second condom incident, she did not report any of these incidents to anyone in management at WSI. *Id.*

Towards the end of November, plaintiff discovered another condom in her coat pocket. *Id.* at 50 (p. 45). As with the prior incidents, plaintiff did not know who placed the third condom in her coat pocket. *Id.* (pp. 45-46). However, a day or two before she found the third condom, one of her co-workers, Larry Rogers, had cornered her in WSI's showroom and demanded that she give him a back rub. *Id.* (pp. 46-48). Prior to the back rub incident, plaintiff alleges that Rogers had also engaged in the following behavior: (1) he called her "Frenchie," *id.* at 50-51 (pp. 48-52), and on one occasion he explained to another coworker in her presence that he did so because she is "half French and . . . French women could do a lot of good things to a man's body;" *id.* (p. 50); (2) on one occasion he tried

to engage her in a discussion about a sex toy magazine, *id.* at 53 (pp. 62-64); and (3) on several occasions he asked her to jump up and down, specifically stating on at least one occasion that he wanted to see her breasts bounce up and down, *id.* at 54 (pp. 65-67).

Prior to the back rub incident in late November, while she found his conduct to be offensive, plaintiff did not consider Rogers' conduct towards her to be sexual harassment. *Id.* at 52 (pp. 53-54), 54 (pp. 66-67), 59 (pp. 93-95). As a result, plaintiff did not report any of the pre-back rub incidents to anyone in management at WSI, and this was a voluntary decision on her part. *Id.* at 52 (pp. 54-55), 53-54 (pp. 64-67), 58 (p. 82). However, on December 1, after finding the third condom in her coat pocket, which she apparently found on November 30, plaintiff reported the finding to her immediate supervisor, Chris Sulzen. *Id.* at 50 (pp. 45-46), 53 (p. 61). Sulzen immediately reported the incident to Susan Miller, the Human Resources Director at WSI's Casper facility, and plaintiff then met with Miller on December 1. *Id.* at 53 (pp. 61-62).

During the meeting with Miller, plaintiff told Miller about each of the incidents involving condoms and pornographic pictures and about each of the offensive incidents involving Rogers, and she stated that she believed that Rogers was probably the person who had placed the condoms and pictures in her coat pocket since his offensive conduct coincided with the appearance of the pictures

-4-

and condoms. *Id.* at 53 (pp. 62-63), 59 (pp. 93-95), 199. Plaintiff also suggested that another co-worker, Justin Achenbach, might be responsible for planting the condoms and pornographic pictures. *Id.* at 199. Plaintiff suggested this because she believed that Achenbach "may have reason to lash out at women," although she also stated that she did not "think it's really [Achenbach]." *Id.*

Duane Prather, the Operations Manager at WSI's Casper facility, attended at least part of the meeting with plaintiff and Miller on December 1. *Id.* at 54 (pp. 67-68). Plaintiff claims that Miller and/or Prather informed her during the meeting on December 1 "that Larry had been in trouble before, and that what he had done there, even if they couldn't prove he was the owner of the condoms but by his remarks he would be fired immediately." *Id.* at 54 (p. 68). Following the meeting with Prather and Miller, plaintiff returned to work and finished her shift for that day without encountering any problems with Rogers. *Id.* at 54-55 (pp. 68-70). There is no indication in the record that either Miller or Prather took any further action on December 1 concerning plaintiff's allegations regarding Rogers and Achenbach.

On the following day, December 2, a Saturday, plaintiff was at work in WSI's warehouse. *Id.* at 55 (p. 70). According to plaintiff, she was bending over to write on an item of stock "when [Rogers] came from somewhere, . . . and he took his hands and wiggled just under the inside of my pants." *Id.* (pp. 70-71).

Plaintiff claims that she "immediately stood up and gave him a dirty look, and he was laughing." *Id.* (p. 71). After Rogers left the area, plaintiff immediately reported the touching incident to Tracy Vigo, an assistant manager. *Id.* at 55 (p. 72), 212 (pp.13-15). After he arrived at work later that day, plaintiff also reported the incident to Prather. *Id.* at 56 (p. 73). Prather then reported the incident to Miller at some point during the weekend. *Id.* at 203 (p. 27). On December 2, Prather also interviewed plaintiff and four other WSI employees who were working in the vicinity of the incident. [2] *Id.* at 213. None of the other employees had witnessed the touching incident. *Id.*

On the morning of Monday, December 4, Miller sent an e-mail to John Wirth, Jr., the President and Chief Executive Officer of WSI, informing him that she and Prather needed to speak with him "ASAP regarding sexual harassment allegations." *Id.* at 228. After a number of phone conversations on December 4

---

[2] As pointed out by plaintiff in her opening brief, there is a factual dispute concerning whether Prather also spoke to Rogers on December 2. *See* Aplt. Br. at 7-8. On the one hand, Prather's notes from December 2 do not indicate that he spoke to Rogers on that day, *see* Aplt. App. at 213, and a document Prather prepared on December 8 states that as of "Monday December 4, 2000 Larry Rogers had yet to be talked to by anyone here," *id.* at 214. Similarly, a document prepared by Miller on December 8 states that "Larry was not talked to about this until Wednesday, Dec. 6, 2000 by Russ Rauchfuss." *Id.* at 220. Prather testified at his deposition, however, that he did speak to Rogers on December 2, a fact he did not recall until October 2001. *Id.* at 208-09 (pp. 32-34), 210-11. Because we must construe the evidence in the record in the light most favorable to plaintiff, we will assume that Prather did not speak to Rogers on December 2.

and 5, Wirth authorized Miller to hire an outside investigator, attorney R.E. Rauchfuss, to investigate plaintiff's allegations, and Miller retained Rauchfuss on December 5. *Id.* at 229 (pp. 27-28), 236 (p. 39). On December 6, Rauchfuss conducted his investigation by interviewing plaintiff, Rogers, and Achenbach. [3] *Id.* at 237 (pp. 18-20). On December 7 or 8, Rauchfuss provided Wirth with a verbal report regarding his investigation. *Id.* at 82 (pp. 37-38). On December 8, Rauchfuss also sent Wirth a written report regarding his investigation. *Id.* at 238 (pp. 22-23). Although a copy of Rauchfuss' written report is not in the record before this court, it is undisputed that Rauchfuss reported to Wirth that Rogers had admitted to engaging in at least some of the offensive conduct alleged by plaintiff but had denied planting the condoms and pornographic pictures in her coat pocket. *See* Aplt. Br. at 10; Aplee. Br. at 9.

Based on the information provided by Rauchfuss, Wirth decided to discipline both Rogers and plaintiff. *See* Aplt. App. at 82 (pp. 38-39), 254-55. Although the record before this court does not contain a copy of the written disciplinary notice that WSI gave to Rogers, WSI has asserted that Rogers was

---

[3] Previously, on December 4, Prather and Miller had also interviewed Achenbach, and he denied ever seeing any condoms or pornographic pictures at WSI. *See* Aplt. App. at 232, 233 (pp. 29-30). On December 4, Prather and Miller also interviewed Art Garcia, a WSI employee who worked with Rogers. *Id.* Garcia told them that he had heard Rogers call plaintiff "frenchy," but he did not "know what that's about." *Id.* at 232.

informed on December 9 that he was going to be suspended from work for two days without pay for violating the company's sexual harassment policy, *see* Aplee. Br. at 9-10, and plaintiff has not disputed WSI's assertion, *see* Aplt. Br. at 13. In addition to being suspended for two days without pay,[4] Rogers was also instructed: (1) to have no further contact with plaintiff; and (2) that he would be severely disciplined or terminated if he contacted plaintiff or again violated the company's sexual harassment policy. *See* Aplt. App. at 251, 254.

Plaintiff received her written "Employee Discipline Notice" on December 11 during a meeting with Miller, Prather, and Vigo. *Id.* at 251, 256. The Notice stated that plaintiff was being disciplined for "[f]ail[ing] to report sexual harassment allegations within one week time period of when alleged harassment began." *Id.* at 256. The Notice also stated that the "Disciplinary Action Taken" was a " **Written Reprimand** ," and that "[i]mmediate improvement in this area is required. Failure to do so may result in your suspension and/or final written warning."[5] *Id.*

---

[4]    It appears from the record that Rogers served his two-day suspension on December 12 and 13. *See* Aplt. App. at 254.

[5]    According to the Notice, a "Final Written Warning" was the third step in WSI's progressive disciplinary process after "Written Reprimand" (the first step) and "Suspension" (the second step). *See* Aplt. App. at 256. The Final Written Warning would inform the offending employee that "[a] reoccurrence of this incident or failure to make the necessary improvements in your performance will result in you being discharged." *Id.*

-8-

During the meeting on December 11, Miller told plaintiff that Rogers "had admitted to part of the allegations against him," *id.* at 251, but Miller apparently did not disclose to plaintiff the specific allegations he had admitted to, *id.* at 254. In addition, in accordance with the instructions she had received from Wirth, Miller instructed plaintiff to tell her husband to stop trying to contact Rauchfuss. *Id.* at 204 (pp. 62-63), 252, 255. [6] The record also indicates that Miller and Prather had previously warned plaintiff that she would be disciplined if she did not stop talking to other employees about the sexual harassment investigation. *Id.* at 214-15, 220.

On the next day, December 12, plaintiff received an "Evaluation Report" that had been prepared by her supervisor, Chris Sulzen. *Id.* at 264 (pp. 46-48). On the first page of the Report, Sulzen reported that "[r]ecently Nancy has become a high maintenance employee. A high level of Managements time, as well as other WSI employees time has been interrupted, causing an undesirable work atmosphere conducive to a high productivity level." *Id.* at 263. Although a complete copy of the Report is not in the record before this court, [7] plaintiff has

---

[6] During the latter part of the week of December 4, plaintiff's husband had called and left a message for Rauchfuss at his office. After consulting with Wirth, Rauchfuss did not return the call. *See* Aplt. App. at 239 (pp. 25-28). This was despite the fact that Rauchfuss had previously assured plaintiff that she could call him at any time if she had any concerns. *Id.* at 238-39 (pp. 23-24, 27-28).

[7] The copy of the performance evaluation that is in the record contains only

(continued...)

-9-

conceded that Sulzen "otherwise gave her satisfactory or good marks on her work performance." Aplt. Br. at 14.

On December 13, plaintiff filed a "Petition Requesting Stalking Protection Order" in state court. *See* Aplt. App. at 258-59. In the petition, plaintiff requested that the court "order that [Rogers] refrain from any further acts of stalking involving [plaintiff]." *Id.* at 258. On December 15, the state court held a hearing regarding the petition, *id.* at 109-34, and Miller, Prather, Sulzen, and Steve Ford (another WSI employee) attended the hearing, *id.* at 249 (pp. 154-55). Prior to the commencement of the hearing, the WSI employees spoke only to Rogers' attorney, and they did not speak to plaintiff. *Id.* (p. 155). Once the hearing began, the WSI employees seated themselves on the side of the courtroom behind Rogers and his attorney. *Id.* (p. 156). Plaintiff testified at her deposition that she believes the WSI employees were "showing force in backing Larry . . . [and] were there to show encouragement on his behalf and not mine." *Id.*

The state court issued a decision letter denying plaintiff's petition on December 18. *Id.* at 265-66. On the same day, plaintiff filed charges of sex discrimination and retaliation against WSI with the Wyoming Fair Employment

---

[7](...continued)
page one of the evaluation, and page one does not contain any performance ratings. *See* Aplt. App. at 263. We therefore assume that plaintiff is referring to a part of the performance evaluation that is not in the current record.

Program (WFEP). [8] *Id.* at 267-68. During the course of its investigation regarding plaintiff's allegations, the WFEP discovered that there were other women at WSI's Casper facility who claimed that had Rogers touched them in an offensive manner, and the WFEP relayed that information to WSI on December 20. *Id.* at 281 (pp. 50-51). After learning of this information, Wirth immediately instructed Miller to interview every female employee at WSI's Casper facility and ask them if Rogers had ever touched them in an offensive manner. *Id.* (pp. 51-52). Miller then conducted the interviews, and she learned that Rogers had previously touched Debbie Ellsbury, an employee of WSI, and Lisa Hughes, an independent contractor. *Id.* at 281 (pp. 51-52), 283 (pp. 9-12), 284 (pp. 10-12). Neither woman had previously reported the incidents to anyone in management at WSI. *Id.* at 283 (pp. 9-10), 284 (p. 12), 286 (pp. 13-14). Miller verbally reprimanded Ellsbury for failing to report the touching incident, *id.* at 286 (pp. 13-14), but Hughes did not receive a reprimand, *id.* at 285 (pp. 17-18).

---

[8] After investigating plaintiff's charges, the WFEP determined that there was reasonable/probable cause to believe the charges to be true. *See* Aplt. App. at 293, 310. The WFEP's determination did not bar the district court from granting WSI's motion for summary judgment. *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir. 1999) (holding that "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one").

In the brief it submitted to the district court in support of its motion for summary judgment, WSI asserted that "[b]ased upon the new information [regarding Ellsbury and Hughes], on December 22, 2000, Rogers was asked to resign. As of that date, Rogers was no longer employed by [WSI]." *Id.* at 18. Although WSI did not submit any evidence to the district court to support these allegations, Plaintiff has not disputed them.

During its investigation regarding plaintiff's allegations concerning Rogers, WSI was aware of an additional prior incident involving Rogers. In June 2000, Miller distributed survey forms to the employees at WSI's Casper facility regarding an upcoming company picnic, and one of the questions pertained to the type of entertainment the employees would like to have at the picnic. *Id.* at 257 (p. 71), 287. When Miller handed one of the survey forms to Rogers, he responded by stating that Miller could "strip." *Id.* Miller reported this incident to Prather, and Prather subsequently met with Rogers and read him the company's sexual harassment policy. *Id.* Prather also gave Rogers a verbal reprimand, telling him to "knock it off." *Id.* at 257 (pp. 71-72), 287. There is no indication in the record that WSI had knowledge of Rogers engaging in any additional offensive behavior between June 2000 and December 2000.

Finally, it is undisputed that plaintiff did not return to her job at WSI at some point after she received the written reprimand on December 11, 2000. [9] It is unclear when plaintiff left WSI, however, as the district court found that plaintiff's last day was December 11, *id.* at 415 (footnote 2), while plaintiff testified at her deposition that her last day was either December 18 or 19, *id.* at 43 (pp. 14-15). Because there appears to be a factual dispute concerning when plaintiff left WSI, we will accept plaintiff's claim that she did not leave until December 18 or 19 as true for purposes of this appeal.

## II. ANALYSIS

The district court concluded that WSI was entitled to summary judgment on each of plaintiff's claims. First, with respect to plaintiff's claim that she was subjected to a sexually hostile work environment, the court concluded that WSI had demonstrated that "its response[s] to the acts of sexual harassment of which it had knowledge were prompt, reasonably calculated to end the harassment, and

---

[9] In her opening brief, plaintiff claims that, following her departure from WSI, "she continued through the WFEP to make clear that she wanted to return. Ultimately, negotiations foundered on the issue of the letter of reprimand, which WSI refused to remove [from her personnel file], and its refusal to guarantee her some physical separation from Larry Rogers." Aplt. Br. at 26 n.2. We note, however, that while Wirth testified at his deposition that he refused to remove the reprimand from plaintiff's personnel file, *see* Aplt. App. at 270 (pp. 77-78), there does not appear to be any record support for plaintiff's assertion that WSI refused to guarantee her physical separation from Rogers. Instead, the record indicates only that plaintiff was unable to transfer to another work area because there were no available openings that were acceptable to her. *Id.* at 204 (p. 62), 252.

-13-

effective." Aplt. App. at 412. The court therefore determined that plaintiff had failed to establish that WSI was liable under a negligence theory for creating a sexually hostile work environment. *Id.* Second, with respect to plaintiff's retaliation claim, the court concluded that "[t]he evidence [in] this case demonstrates that Plaintiff was reprimanded for her own protection and that [WSI] took steps reasonably calculated to end the harassment once it was made aware of the allegations of harassment." *Id.* at 417. As a result, the court was "unable to conclude . . . that the written reprimand for failing to comply with the sexual harassment policy constituted an adverse employment action." *Id.* Lastly, after noting that plaintiff's pleadings "appear[ed]" to assert a claim for constructive discharge, the court concluded that plaintiff "was not constructively discharged in this case because she resigned of her own free will." *Id.* at 415 (footnote 2).

Plaintiff argues that the district court committed reversible error because it construed and decided genuine issues of material fact adversely to her. We agree with plaintiff that the district court should have framed its conclusions in a manner more consistent with the standards for summary judgment under Fed. R. Civ. P. 56. For the reasons set forth below, we nonetheless conclude that the district court reached the proper result, and we therefore affirm the entry of summary judgment on each of plaintiff's claims.

**A. Standard of Review.**

"We review the district court's grant of summary judgment de novo,

applying the same legal standard used by the district court." *Simms v. Okla. ex*

*rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th

Cir. 1999). Summary judgment is appropriate if "there is no genuine issue as to

any material fact and [ ] the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c).

> We examine the record to determine whether any genuine issue of
> material fact was in dispute; if not, we determine whether the
> substantive law was applied correctly, and in so doing we examine
> the factual record and reasonable inferences therefrom in the light
> most favorable to the party opposing the motion. However, where
> the non moving party will bear the burden of proof at trial on a
> dispositive issue[,] that party must go beyond the pleadings and
> designate specific facts so as to make a showing sufficient to
> establish the existence of an element essential to that party's case in
> order to survive summary judgment.

*Neal v. Roche*, 349 F.3d 1246, 1249 (10th Cir. 2003) (quotation omitted).

**B. Hostile Work Environment Sexual Harassment.**

> Title VII's prohibition of employment discrimination based on sex
> encompasses hostile work environment sexual harassment. *See*
> 42 U.S.C. § 2000e-2(a)(1); *Hirschfeld v. New Mexico Corrections*
> *Dep't*, 916 F.2d 572, 575 (10th Cir. 1990). This harassment occurs
> where "[sexual] conduct has the purpose or effect of unreasonably
> interfering with an individual's work performance or creating an
> intimidating, hostile, or offensive working environment." *Meritor*
> *Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65 . . . (1986) (quoting
> 29 C.F.R. § 1604.11(a)(3) (1985)). To form the basis of a claim, the
> sexual harassment "must be sufficiently severe or pervasive 'to alter
> the conditions of [the victim's] employment and create an abusive

working environment.'" *Id.* at 67 . . . (alteration in original) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 902 (11th Cir. 1982)).

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

In addition to having to prove that she was subjected to a sexually hostile work environment, plaintiff must also establish a basis for imposing liability on WSI. *See Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000) ("To survive summary judgment under Title VII, the record must support an inference of a [sexually] hostile work environment *and* a basis for employer liability.") (emphasis in original). We conclude that plaintiff failed to establish the existence of a genuine issue of material fact for trial concerning the liability of WSI. "Because we dispose of [plaintiff's] claim based on the absence of employer liability, we need not resolve . . . the issue of the presence of a hostile work environment." *Id.*

There are three alternative bases for holding an employer liable for hostile work environment sexual harassment. *Adler*, 144 F.3d at 673. "These are (1) where the acts are committed by an employee acting 'within the scope of [his or her] employment'; (2) where the employer was negligent or reckless; or (3) where the employee purported to act or to speak on behalf of the employer." *Id.* (quotation omitted). The only basis alleged by plaintiff for employer liability in this case is WSI's alleged negligence in allowing fellow employees to engage in sexual harassment. "Under this theory of employer liability, the plaintiff must

-16-

establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Id.* (quotation omitted).

> A plaintiff demonstrates actual employer knowledge where the plaintiff has reported harassment to management-level employees. An employer may be deemed to have constructive knowledge of . . . harassment where the pervasiveness of the harassment supports an inference of employer knowledge. Only when the acts of harassment are so egregious, numerous, and concentrated as to add up to a campaign of harassment will the employer be liable for failure to discover the harassment.

*Ford*, 222 F.3d at 776 (citations and quotations omitted).

"In addition to an employer's actual or constructive knowledge, we must also consider the reasonableness of the employer's response to any harassment about which it knew or should have known." *Id.* "An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action." *Adler,* 144 F.3d at 676. As we have recognized, "the test . . . [is] whether the remedial and preventative action was 'reasonably calculated to end the harassment,'" *id.* (quotation omitted), and "[p]laintiff bears the burden of presenting evidence establishing a genuine issue of fact that the employer's response was unreasonable," *Ford*, 222 F.3d at 776; *see also Scarberry v. ExxonMobil Oil Corp.*, 328 F.3d 1255, 1257 (10th Cir. 2003) (noting that this "court may simply examine the record, including the undisputed evidence, to

determine whether [an employer's] responses to claims of sexual harassment were reasonable as a matter of law").

In analyzing the propriety of summary judgment in this case, we must also keep in mind that, while Rogers denies placing the condoms and pornographic pictures in plaintiff's coat pocket, the record is undisputed that he engaged in repeat conduct that was sexually offensive. Although there is no definitive test to measure an employer's response to repeat conduct, we have provided the following guidance for analyzing the issue of employer liability in cases involving repeat conduct:

> The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective. Repeat conduct may show the unreasonableness of prior responses. On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable. It follows that an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to the end the harassment. *See Hirschfeld*, 916 F.2d at 579 n.6. ("While there may be egregious cases where such action is the only option for an employer, in less serious cases a reprimand, brief suspension, or other remedial steps may be sufficient to remedy the situation."). . . .

> Unfortunately, some harassers may simply never change. Just as unfortunate, a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a "hard head" case. It is some consolation for the victim that, to be reasonable, responses must progress more rapidly in proportion to more serious and frequent harassment. The courts, however, must balance the victim's

rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination.

*Adler*, 144 F.3d at 676-77.

We conclude that plaintiff failed to put forth sufficient evidence to establish that WSI responded inadequately to her reports about Rogers. As set forth above, the record shows that: (1) Rogers was verbally reprimanded for the offensive comment he made to Miller in June 2000 (the first incident of offensive conduct involving Rogers that was known to WSI), and there is no indication in the record that WSI had knowledge of Rogers engaging in any additional offensive conduct between June 2000 and December 2000; (2) after learning of plaintiff's allegations regarding Rogers, WSI, acting through, Wirth, Miller, and Prather, promptly hired an outside investigator to investigate plaintiff's allegations, and the investigator completed his investigation on December 6 or 7 and issued a written report on December 8; (3) on December 9, WSI gave Rogers a written reprimand and suspended him for two days without pay; (4) WSI had no knowledge that Rogers had touched other women at its Casper facility in an offensive manner until it received information to that effect from the WFEP on December 20; and (5) after it received the information from the WFEP, WSI immediately interviewed all of the female employees at its Casper facility, and,

-19-

after it learned about the incidents involving Ellsbury and Hughes, WSI obtained Rogers' resignation on December 22.

In her opening brief, plaintiff argues that the record is sufficient to support a jury finding of employer liability because WSI " *should* have known" before December 1, 2000 that a sexually hostile work environment existed at its Casper facility. *See* Aplt. Br. at 34 (emphasis in original). Alternatively, plaintiff argues that WSI was negligent in not preventing the touching incident on December 2 because it failed to take immediate action against Rogers based on the information it learned from plaintiff on December 1. *Id.* at 31, 33, 36. Both of these arguments are without merit.

To begin with, as noted above, there must be evidence of pervasive sexual harassment in the workplace before an employer may be deemed to have constructive knowledge of the harassment, *see Ford*, 222 F.3d at 776, 777, and this requires acts of harassment "so egregious, numerous, and concentrated as to add up to a campaign of harassment," *id.* at 777 (quotation omitted). In this case, there is insufficient evidence in the record to support an inference that WSI had constructive knowledge of sexual harassment at its Casper facility prior to December 1, 2000. [10]

_____

[10] In her opening brief, plaintiff also suggests that constructive knowledge can be imposed on WSI because its sexual harassment policy deterred victims of

(continued...)

We also conclude that no rational jury could find that WSI's investigation was inadequate because it failed to take affirmative action against Rogers within twenty-four hours of plaintiff's first reports of harassment on December 1.

## C. Retaliation.

Plaintiff's retaliation claim is based on 42 U.S.C. § 2000e-3(a),[11] and we analyze the claim under the *McDonnell Douglas* burden-shifting framework. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).

> Under that framework, Plaintiff must first establish a prima facie case by showing "that: (1) [she] engaged in protected opposition to discrimination; (2) [she] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). "Once [Plaintiff] makes a prima facie showing, [defendant] must articulate a legitimate, nondiscriminatory reason for the adverse employment action. [Plaintiff] must [then] respond by demonstrating [that defendant's] asserted reasons for the adverse action are pretextual." *Id.* (internal citation omitted).

*Id.* (alterations in original except for insertion of "defendant" where indicated).

---

[10](...continued)
harassment from reporting the offending conduct. *See* Aplt. Br. at 34-35. Constructive knowledge cannot be inferred on that basis, however, because plaintiff has made no showing that she or any other women at WSI's Casper facility failed to report sexual harassment because of WSI's policy.

[11]     42 U.S.C. § 2000e-3(a) provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter. . . ."

We conclude that plaintiff failed to establish a prima facie case of retaliation because she failed to show that she suffered an adverse employment action. Accordingly, we affirm the entry of summary judgment on plaintiff's retaliation claim on that basis, and we do not need to address the other elements of the prima facie case or the nondiscriminatory reason/pretext issues.

**1. Written Reprimand and Performance Evaluation.**

Plaintiff argues that the written reprimand that she received on December 11, 2000 and the negative performance evaluation that she received on December 12, 2000 were adverse employment actions that WSI took in retaliation for her complaints regarding Rogers. We conclude that plaintiff failed to put forth sufficient evidence to establish that either the reprimand or the performance evaluation were adverse employment actions.

To establish an adverse employment action, the employee must demonstrate that the employer's conduct was "'materially adverse' to the employee's job status." *Wells*, 325 F.3d at 1213 (quoting *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998)). "Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action." *Sanchez*, 164 F.3d at 532 (quotation omitted). Instead, to qualify as an adverse employment action, the action must result in "a significant change in employment status, such as . . . firing, failing to promote, reassignment with

-22-

significantly different responsibilities, or a decision causing a significant change in benefits." *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

"[U]nsubstantiated oral reprimands and unnecessary derogatory comments . . . are not included within the definition of adverse [employment] action absent evidence that they had some impact on the employee's employment status." *Sanchez*, 164 F.3d at 533 (quotation omitted); *accord Wells*, 325 F.3d at 1214. Similarly, we have held that a satisfactory performance evaluation, although lower than previous evaluations, was not an adverse employment action where the employee "presented no evidence of adverse action relating to her evaluation." *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994); *see also Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (holding that negative performance evaluation was not an adverse employment action where employer did not take any other action against employee); *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (same).

The written reprimand that WSI issued to plaintiff constituted a first step in WSI's progressive disciplinary process, and the reprimand expressly stated that plaintiff could be suspended and/or terminated if she failed to comply with the company's sexual harassment policy in the future. But it is also undisputed that WSI did not take any other action against plaintiff in connection with the

reprimand. As a result, she has made no showing that the reprimand had any immediate or practical effect on her job status. We therefore conclude that there is insufficient evidence in the record to establish that the written reprimand was an adverse employment action. *See Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (holding that oral and written reprimands received by employee pursuant to employer's progressive disciplinary process did not implicate sufficiently tangible job consequences to constitute an independent basis for liability under Title VII, notwithstanding that each reprimand brought employee closer to termination, absent evidence of any immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities); *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (holding that an employee who received a "notice of discipline" and a "counseling memo" did not suffer an adverse employment action where employee did not allege any facts showing a materially adverse change in her working conditions).

We reach the same conclusion with respect to the performance evaluation that plaintiff received from Sulzen. Although Sulzen's "high maintenance" comment on page one of the evaluation appears to be directly related to plaintiff's complaints about Rogers, *see* Aplt. App. at 264 (p. 48), plaintiff has conceded that Sulzen "otherwise gave her satisfactory or good marks on her work

performance," Aplt. Br. at 14.  In addition, while plaintiff claims in her opening brief that "the performance evaluation was key to [WSI's] decision not to give [her] a raise at the 90-day point [of her employment]," *id.* at 38, plaintiff's assertion regarding the raise is not supported by any evidence in the record.  To the contrary, the record is devoid of any evidence showing that the performance evaluation had an adverse effect on plaintiff's job status.  Thus, we conclude that plaintiff failed to show that the performance evaluation constituted an adverse employment action.

### 2.  Co-Worker Hostility and Retaliatory Harassment.

Plaintiff testified at her deposition that she was "shunned" by her co-workers as a result of her complaints regarding Rogers.  *See* Aplt. App. at 58 (p. 84).  While plaintiff has not explicitly pled a cause of action based on co-worker retaliation, it also appears that the allegations in plaintiff's original and first amended complaints are broad enough to state a claim under Title VII for co-worker retaliation.  *See* R. Doc. 1 at 10-12; Aplt. App. at 153-56, 160.

We have recognized that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim."  *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).  But "an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either

-25-

(1) orchestrate[d] the harassment or (2) [knew] about the harassment and acquiesce[d] in it in such a manner as to condone and encourage the co-workers' actions." *Id.* at 1265.

In her opening brief, plaintiff asserts that Prather "falsely leaked to [Achenbach] that she had accused [him] of being the perpetrator of the condoms and pictures, with the predictable effect of making her an instant pariah among her contemporaries." Aplt. Br. at 29. However, plaintiff has failed to put forth any specific facts or evidence from which a jury could infer that any of her supervisors acted with the intent to orchestrate or condone or encourage co-worker hostility or retaliatory harassment. *See Gunnell*, 152 F.3d at 1265 (noting that co-worker harassment "must be intentional on the part of the employer"). As a result, there is insufficient evidence in the record to support a claim against WSI based on co-worker hostility or retaliatory harassment. Thus, we do not reach whether she has alleged sufficient severity of co-worker hostility to rise to the level of adverse employment action.

## D. Constructive Discharge.

In her original complaint, plaintiff alleged as part of her retaliation claim that she was constructively discharged from her job at WSI. *See* R., Doc. 1 at 12. "Constructive discharge, like actual discharge, is a materially adverse employment action." *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th

-26-

Cir. 2002).  It also appears that plaintiff asserted constructive discharge as a separate and independent cause of action in her first amended complaint.  *See* Aplt. App. at 159.  Regardless of whether we analyze plaintiff's constructive discharge claim as part of her retaliation claim or as a separate and independent cause of action, we conclude that WSI was entitled to summary judgment on the claim.

"In the typical Title VII constructive discharge case, the plaintiff asserts she was forced from her job due to the alleged sex discrimination.  However, we have found constructive discharge based on retributive acts that follow a complaint of sex discrimination."  *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998).  Plaintiff's constructive discharge claim falls into the latter category, but this does not affect the showing that she must make in order to raise triable issues of fact on the claim.

> In order to make out a constructive discharge claim, [a plaintiff] must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable.  The plaintiff's subjective view of the employment environment and the employer's subjective intent with regard to discharging her are both irrelevant.  If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged.  Essentially, a plaintiff must show that she had no other choice but to quit.

*Id.* (quotation and citations omitted);  *see also Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986) (noting that "the question on which constructive

discharge cases turn is simply whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign"). Consequently, "[t]he question is not whether [plaintiff's] resignation resulted from [WSI's] actions, but whether [plaintiff] had any other reasonable choice but to resign in light of those actions." *Tran v. Trs. of the State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004).

There is no question that the work environment at WSI was unpleasant for plaintiff between December 1 and December 18 or 19, 2000. We nonetheless conclude that no rational jury could find that a reasonable person would have felt compelled to resign as the only feasible option. Most importantly, it is undisputed that Rogers did not engage in any additional offensive conduct after plaintiff reported the offensive touching incident that occurred on December 2. *See* Aplt. App. at 57 (p. 80).

Finally, plaintiff's subjective belief that she was shunned by her co-workers is irrelevant to our analysis of her constructive discharge claim. *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857-58 (10th Cir. 2000) (holding that an employee's subjective belief that her co-employees were isolating her was not relevant to constructive discharge claim); *Sanchez*, 164 F.3d at 534 (noting that "the plaintiff's subjective views of the situation are irrelevant") (quotation

omitted).  Instead, we must focus exclusively on the objective evidence in the record.  Having done so, we conclude that plaintiff failed to put forth sufficient objective evidence to support her claim that the conduct of her co-workers made her job intolerable within two weeks of her reporting the touching incident.

The judgment of the district court is AFFIRMED.

Entered for the Court


David M. Ebel
Circuit Judge